IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLARISSIA JONES | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-01933-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated August 6, 2015 (doc. 18), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Appeal Brief*, filed September 21, 2015 (doc. 23), and *Defendant's Response Brief*, filed October 19, 2015 (doc. 25).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I.   BACKGROUND[1]

### A.   Procedural History

Clarissia Jones[2] (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and supplemental security income (SSI) under Title XVI of the Act.  (R. at 9, 16-32.) On January 15, 2003, Plaintiff applied for DIB

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  Plaintiff's brief identifies her as "Clarissa", (doc. 23), but the record reflects that the correct spelling of her name is "Clarissia." (*See* R. at 16-32.)

and SSI, alleging disability beginning on August 16, 2002, due to her learning disorder and depression. (R. at 52-53, 208-209B.) Her claims were initially denied on April 10, 2003, and upon reconsideration on August 12, 2003. (R. at 37-40, 43-44.) Plaintiff requested a hearing before an administrative law judge (ALJ), and her attorney subsequently appeared at a hearing on August 29, 2006, and requested a decision based on the evidence in the record. (R. at 212-15.) On February 23, 2007, the ALJ issued a decision finding Plaintiff not disabled. (R. at 212C-215.) Plaintiff timely appealed to the Appeals Council, which vacated the ALJ's decision and remanded the case for further proceedings on November 19, 2007. (R. at 216-220.)

On February 12, 2008, a second hearing was held before the ALJ, and Plaintiff personally appeared and testified. (R. at 382-99.) The ALJ denied her claims on October 1, 2008, finding her not disabled. (R. at 252-64.) Plaintiff timely appealed to the Appeals Council, which vacated the ALJ's decision and remanded the case for further proceedings on August 13, 2010. (R. at 268-71.)

On May 9, 2011, a third hearing was scheduled before the ALJ, but Plaintiff waived her appearance and submitted a brief in support of her request for a decision based upon the evidence in the record. (R. at 298-302, 324-27.) The ALJ denied Plaintiff's claims on June 6, 2011, finding her not disabled. (R. at 342-54.)  She timely appealed to the Appeals Council, which vacated the ALJ's decision and remanded the case for further proceedings on May 6, 2013. (R. at 355-57.)

On May 22, 2013, Plaintiff waived her rights to personally appear and testify at the fourth hearing scheduled before the ALJ and submitted a brief arguing for a closed period of disability from April 16, 2002, through May 31, 2008. (R. at 358-60.) The ALJ denied her claims on June 5, 2014, finding her not disabled. (R. at 16-32.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 12-15.) The Appeals Council denied her request for review, and the ALJ's

decision became the final decision of the Commissioner. (R. at 9-11.)  Plaintiff timely appealed under 42 U.S.C. § 405(g).

**B.**     <u>**Factual History**</u>

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on August 16, 1984, and was 23 years old at the time of the hearing on February 12, 2008. (R. at 386.) She completed the tenth grade and had not earned a GED. (R. at 386-88.) She had no past relevant work experience because she had not remained at any job long enough for her earnings to be at a level consistent with substantial gainful activity. (R. at 31.)

    **2.**     **Medical, Psychological, and Psychiatric Evidence**

Plaintiff received a psychoeducational evaluation by school psychologist Linda Speer Graham, Ed. S., on September 7, 1996, when she was twelve years old and in the sixth grade. (R. at 101-06.) Ms. Graham reported that Plaintiff was able to get along with friends and express herself, but she became angry and cried easily. (R. at 101.) She also reported that Plaintiff's scores on the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) indicated that her overall intellectual ability was in the borderline range with a verbal IQ of 78, a performance IQ of 82, and a full scale IQ of 78. (R. at 102.) Her scores on the Bender Visual Motor Gestalt test (BVMG) suggested a developmental age of eight years six months to eight years eleven months. (R. at 103.) Ms. Graham opined that her overall intellectual ability was in the borderline range ,and that "95 times out of 100 her Full Scale IQ can be expected to fall within Standard Score 73-85 range." (R. at 104.) She recommended that Plaintiff undergo further language testing to "address the possible deficit listening comprehension area" and receive special education services in English. (R. at 104.)

From October 1, 1999, to October 8, 1999, at age fifteen, Plaintiff was a patient at St. Bernards Behavioral Health for major depression after a violent incident with two girls at school. (R. at 107-25.)  She was diagnosed with intermittent explosive disorder and assigned a current Global Assessment of Functioning[3] (GAF) score of 50, with a highest past year GAF score of 85. She underwent group, individual, family, and activity therapy. (R. at 108.)

Between January 13, 2003, and February 21, 2003, Plaintiff received treatment for depression at Mid-South Health Systems. (R. at 129-36.) She was eighteen years old and had dropped out of school. (R. at 130.) She was treated by Dr. David D. Erby, M.D., who noted that Plaintiff first began receiving treatment for depression when she was ten years old and had been prescribed Ritalin, Paxil, and Trazodone, none of which were successful. (R. 130-31.) He also noted that Plaintiff was sad and her mood depressed during the mental status examination. (R. at 133.) Dr. Erby diagnosed her with depressive disorder, prescribed her with Lexapro 10mg, and assigned her a GAF score of 58. (R. at 130-31, 135-36.)

On July 18, 2003, Plaintiff received a consultative psychological evaluation by George M. DeRoeck, Psy. D. (R. at 137-45.) She was eighteen years old during the evaluation. (R. at 138.) He evaluated her mental status, intellectual functioning, abstract reasoning, and adaptive functioning. (R. at 141-44.) He noted that Plaintiff was "attentive within the session" but was "somewhat impulsive" with "significant periods of irritability." (R. at 144.) He opined that Plaintiff's adaptive functioning level was indicative of "lower end of low average to upper borderline intellectual development" and not mental retardation because she reported that she was able to care for the needs of both herself and her children by cooking, cleaning, grooming, shopping, and managing money.

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).

(R. at 143-44.) He diagnosed her with major depressive disorder (chronic without psychotic features), intermittent explosive disorder, and a learning disorder (reading/math skills). He assigned a current GAF score of 45 and a highest past year GAF score of 55. (R. at 144.)

On April 1, 2003, psychologist Brad Williams, Ph. D., a state agency medical consultant (SAMC), completed a Psychiatric Review Technique form (PRTF). (R. at 164-83.) He determined that a RFC assessment was necessary and completed a Mental Residual Functional Capacity Assessment Form. (R. at 174.) He opined that Plaintiff had mild restrictions in daily living, and moderate difficulties in maintaining social functioning and concentration, persistence or pace, and that she was "able to perform work where interpersonal contact is routine but superficial [and where the] complexity of tasks is learned by experience." (R at 182.)

On August 11, 2003, Dr. Kathryn M. Gale, M.D., a SAMC, also completed a PRTF. (R. at 146-63.) She determined that a RFC assessment was necessary and completed a Mental Residual Functional Capacity Assessment form. (R. at 160.) She agreed with Dr. Williams's assessment and determined that Plaintiff had mild restrictions on daily living and moderate difficulties in maintaining social functioning and concentration, persistence or pace, but she was "able to perform work where interpersonal contact is incidental to work performed [and where] complexity of tasks is learned and performed by rote, few variables." (R. at 156, 162.)

On July 1, 2003, Plaintiff was again treated by Dr. Erby, who noted that she had continuing episodes of excitement and depression but seemed "somewhat rehearsed." (R. at 184.) He noted that there was no evidence of psychomotor retardation and no evidence of mania or hypomania. (R. at 184.) He diagnosed depressive disorder and assigned a current GAF score of 58. (R. at 184.)

On December 20, 2005, Stephen Harris, Ph.D., conducted an intellectual assessment and evaluation of adaptive functioning of Plaintiff. (R. at 200-07.) She was 21 years old at the time of the evaluation. (R. at 200.) He administered a WAIS-III test that indicated that Plaintiff was "in the mild range of retardation" with a verbal IQ of 66, a performance IQ of 67, and a full scale IQ of 64. (R. at 201-03.) He opined that Plaintiff's adaptive functioning level appeared to be commensurate with a mild range of retardation because she became frustrated easily, stayed home most of the time, did not help with the household shopping or chores, and did not use a checkbook. (R. at 201.) He also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) in which he concluded that were no marked or extreme restrictions on Plaintiff's ability to understand, remember, and carry out instructions or on her ability to respond appropriately to supervision, co-workers, and work pressure in a work setting. (R. at 207.)

### 3.    Hearing Testimony from February 12, 2008[4]

On February 12, 2008, Plaintiff testified at a hearing before the ALJ. (R at 382-99.) She was represented by an attorney. (R. at 384.) A vocational expert (VE) was also present but did not testify.

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 23 years old and had completed the tenth grade. (R. at 386.) She could read but had difficulty comprehending and could not add or subtract well enough to make sure that a cashier gave her correct change at the grocery store. (R. at 386-87.) She unsuccessfully attempted to obtain her GED. (R. at 388.) She testified that she was enrolled in a ten-month medical assistant program and had completed half of the program with grades comprised of As, Bs, Cs, a few

---

[4] Hearings were also scheduled on August 29, 2006, May 9, 2011, and May 22, 2013, but no testimony was taken at any of these hearings, and there are no transcripts in the record for any other hearing other than the one on February 12, 2008. (R. at 212-15, 298-302, 324-27, 358-60.)

Ds and one F. (R. at 389, 396.) She planned to finish the program and graduate in May 2008, but was not sure if she would be able to continue because she was feeling depressed. (R. at 389, 397.)

From March 2006 to August 2006, Plaintiff worked as a customer service representative at the Jonesboro Sun newspaper and made a total of $4,531.00. (R. at 390.) She left this position because she "got depressed and was messing up a lot of things." (R. at 390.) From the "first part" of September 2006 to September 21, 2006, Plaintiff worked at a store called City Trends. (R. at 390.) She then worked for "three to four weeks" at "Maybelline at the Staffmart" during December 2007. (R. at 391.) Plaintiff explained that she was unable to work eight hours a day for five days a week on a consistent basis because she could not "figure out what [she was] supposed to do" and then would become "so frustrated that [she would] quit." (R. at 392.)

Plaintiff lived with her six-year-old son and her eight-month-old daughter. (R. at 394.) Her sister had been helping care for them but "just moved out maybe two or three weeks ago." (R at 394.) Plaintiff did not have any problems taking care of her son and getting him ready for school, but she sometimes "need[ed] a break" from her daughter if the child had been crying. (R. at 394.)

Plaintiff further testified that she suffered from an explosive disorder and depression. (R. at 391.) She had previously taken medication to help these problems but could no longer do so because she did not have health insurance and could not afford to visit a psychiatrist. (R. at 398.)

C.   **The ALJ's Findings**

The ALJ issued his decision denying benefits on June 5, 2014.  (R. at 16-32.)  At step one,[5] he found that Plaintiff had not engaged in substantial gainful activity from August 16, 2002, through

---

[5] A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act, which is described more fully below.

May 31, 2008, the closed period she requested. (R. at 23.) At step two, he found that Plaintiff had

the following severe impairments: learning disability (low IQ scores) and a mood disorder. (R. at

23.) Despite those impairments, at step three, he found that Plaintiff had no impairment or

combination of impairments that met or equaled the severity of one of the impairments listed in the

social security regulations. (R. at 27.) Next, the ALJ determined that Plaintiff had the following RFC

for the period of August 16, 2002, through May 31, 2008: she could perform a full range of work

at all exertional levels but was limited to understanding, remembering, and carrying out simple

instructions and making simple judgments commensurate with the functions of unskilled work, *i.e.*,

simple work related decisions, responding appropriately to supervision, co-workers, and usual work

situations and dealing with change in a routine work setting. (R. at 29.)

At step four, the ALJ found that Plaintiff had no past relevant work prior to June 2008, as

she had not remained at any job long enough for her earnings to be at a level consistent with

substantial gainful activity. (R. at 31.) At step five, the ALJ considered Plaintiff's RFC, age,

education, and work experience in conjunction with the Medical-Vocational Guidelines (Grids) and

found her capable of performing work that existed in significant numbers in the national economy.

(R. at 31.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined

by the Social Security Act, from August 16, 2002, through May 31, 2008. (R. at 32.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

9

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    **Issues for Review**

Plaintiff raises two issues for review:

1.    Whether the ALJ's finding at step three that Plaintiff did not meet the requirements for listing 12.05C for the period from August 16, 2002, through May 31, 2008, is supported by substantial evidence on the record as a whole.

2.    Whether the ALJ properly applied the Medical-Vocational Guidelines at step five to find Plaintiff not disabled for the period from August 16, 2002, through May 31, 2008, when she suffered from significant non-exertional impairments.

(doc. 23 at 1.)

**C.**    **Listed Impairment 12.05C**

Plaintiff argues that remand is required because the ALJ erred at step three by failing to find that she was disabled under listing 12.05C (mental retardation). (Doc. 23 at 12.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, at step three the ALJ must determine whether the claimant's impairment

11

meets or medically equals one of the impairments listed in the regulations.[6] *Compton v. Astrue*, No. 3:09-CV-0515 B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d) (2012). The claimant has the burden of proving that his impairment or combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that her unlisted impairment or combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to *all* the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2).

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation and four sets of criteria contained in paragraphs A through D:

12.05 Mental retardation:[7]

Mental retardation refers to significantly subaverage general intellectual functioning

---

[6]   These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[7]   This regulation was revised in 2013 and now refers to "intellectual disability" rather than "mental retardation." *See, e.g.*, *Illig v. Comm'r of Soc. Sec.*, 2014 WL 2937036, at *2 n. 7 (3d Cir. July 1, 2014) (*citing* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013)). The substantive requirements of the listing have not changed. Many of the cases cited in this memorandum opinion and order refer to the previous version of the listing, and, as such, the court uses the terms "mental retardation" and "intellectual disability" interchangeably. *See Williams v. Colvin*, No. 3:14-CV-0107-D, 2014 WL 4626354, at *3 (N.D. Tex. Sept. 16, 2014)

with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (*e.g.*, toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2013).

For paragraph C of listing 12.05, the IQ threshold is not the only requirement. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2013).   A claimant must also show that she meets the requirements in the introductory paragraph (or diagnostic description of mental retardation) by pointing to evidence that she suffered from significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22.  *Randall v. Astrue*, 570 F.3d 651, 659 (5th Cir. 2009). "Adaptive functions" are activities such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office." *See Campos*, 2009 WL 1586194, at *2 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1)).

Plaintiff contends that she met the requirements for listing 12.05C because of her low IQ scores at Dr. Harris's examination on December 20, 2005, when she was 21 years old, based on scores of 66 in verbal, 67 in performance, and 64 in full scale. (Doc. 23 at 13-14.) She relies upon her testimony from the hearing before the ALJ on February 12, 2008, and Dr. Harris's evaluation of her adaptive functioning, in order to show that she met the introductory requirements of listing 12.05C. (Doc. 23 at 13-16.) Plaintiff testified that she was in special education classes in high school, had difficulty comprehending while reading, and was unable to obtain her GED. (R. at 386-87.) Likewise, Dr. Harris opined that Plaintiff's adaptive functioning level appeared to be commensurate with a mild range of retardation because Plaintiff became frustrated easily, stayed home most of the time, did not help with the household shopping or chores, and did not use a checkbook. (R. at 201.)

Here, the ALJ rejected Dr. Harris's evaluation of Plaintiff's adaptive functioning because the "basis for establishing that adaptive functioning is at the mental retardation level is a self-report inconsistent with her earlier statements" and it was inconsistent with other medical opinion evidence from Dr. DeRoeck. (R. at 30.) Dr. DeRoeck opined that Plaintiff's adaptative functioning level was indicative of "lower end of low average to upper borderline intellectual development," and not mental retardation,[8] because she was attentive during the evaluation and reported that she was able to care for the needs of both herself and her children by cooking, cleaning, grooming, shopping, and managing money. (R. at 143-44.) Plaintiff also contradicted her self-report during Dr. Harris's evaluation when she testified at the hearing before the ALJ that she did indeed leave the house often

---

[8] A diagnosis of borderline intellectual development is not equivalent to a diagnosis of intellectually disabled or mentally retarded. *See, e.g., Arce v. Barnhart*, 185 F. App'x. 437, 439 (5th Cir. 2006) (per curiam) ("As discussed above, substantial evidence supported the ALJ's conclusion that [the claimant] has borderline intelligence but is not mentally retarded.").

and did help out with the household cleaning and shopping.  (R. at 388-98.)

The ALJ's finding that Plaintiff could not satisfy listing 12.05C is not erroneous. *See Arce v. Barnhart,* 185 F. App'x. 437, 438–39 (5th Cir. 2006) (per curiam) (holding that claimant could not satisfy listing 12.05C where claimant could perform housecleaning tasks, use computer, and did not need help grooming or communicating); *Bordelon v. Shalala,* 41 F.3d 661, 1994 WL 684574, at *1 (5th Cir. Nov. 15, 1994) (per curiam) (holding that ALJ's decision that IQ tests overstated claimant's degree of mental impairment supported by substantial evidence where there was evidence that claimant held several jobs and cared for his two children). The ALJ's step three finding that Plaintiff did not fulfill her burden to show her mental impairments met or medically equaled a listed impairment is supported by substantial evidence, and remand is not warranted on this basis.

## D.      **Medical-Vocational Guidelines**

Plaintiff argues that the ALJ erred at step five by improperly relying solely on the Medical-Vocational Guidelines to find that she was not disabled. (Doc. 23 at 16-17.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [his] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of

proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[9] or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids."[10] *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). An ALJ may rely exclusively on the Grids if the impairments are solely exertional,[11] or if the nonexertional impairments do not sufficiently or significantly[12] affect the RFC. *Newton*, 209 F.3d at 458 (citing *Fraga*, 810 F.2d at 1304 (stating that when "the claimant either suffers only from

---

[9] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir.2000)). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that despite an impairment, a claimant could perform available work. *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001).

[10] The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[11] Under the Social Security regulations, impairments are either exertional or nonexertional. Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. All other impairments are classified as nonexertional. *See Holiday v. Barnhart*, 460 F.Supp.2d 790, 806 (S.D. Tex. 2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) and 20 C.F.R. § 404.1569(a)); *see also* Social Security Ruling (SSR) 96-9P (1996), 1996 WL 374185, at *5 ("[A] nonexertional limitation is an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." (emphasis original)).

[12] *Compare Newton*, 209 F.3d at 458 (the nonexertional impairments "do not *sufficiently*" affect the RFC) (emphasis added), *with Selders*, 914 F.2d at 619 (the nonexertional impairments "do not *significantly*" affect the RFC) (emphasis added); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987) (same).

exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform.")).  If the claimant suffers from nonexertional impairments, or a combination of exertional and nonexertional impairments, then the ALJ must rely on the testimony of a VE or other similar evidence to establish that such jobs exist in the economy. *Id*.  The Grids explicitly state that they "do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional impairments."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1).

Even when the claimant is so affected by a nonexertional impairment as to preclude resort to the Grids, they "may nevertheless be consulted as a 'framework' for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contradicted by the nonexertional limitations." *Moore v. Social Sec. Admin.*, 153 F. App'x 945, 947 (5th Cir. 2005) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (2005)). "If the applicable rule directs a finding that plaintiff is not disabled, [however,] the Commissioner [must] consider nonexertional limitations and utilize the testimony of a vocational expert."  *Rodriguez*, 2006 WL 3779777, at *2; *see also Gonzalez v. Astrue*, No. M-09-210, 2013 WL 1345298, at *9 n.14 (S.D. Tex. Mar. 29, 2013) (observing that courts and legal scholars have noted that "how exactly the grids provide . . . a framework is unclear . . . [but] one thing is clear: Where the claimant's characteristics do not 'coincide exactly' with a Grid rule, the ALJ should introduce expert vocational testimony to further assist him in his 'Grids framework' guided analysis.") (citing *Lawler v. Heckler*, 761 F.2d 195, 197-98 (5th Cir. 1985)).

Here, the ALJ found at step two that Plaintiff had the severe impairments of a learning

17

disability and a mood disorder. (R. at 23.) Although he found that these impairments did not meet or equal a listed impairment, he found they affected Plaintiff's RFC because they limited her to the ability to understand, remember and carry out simple instructions, and to make simple judgments commensurate with the functions of unskilled work. (R. at 29-31.) At step five, the ALJ found that Plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations" but they "have little or no effect on the occupational base of unskilled work at all exertional levels." (R. at 31.) Ultimately, the ALJ concluded that "a finding of 'not disabled' is appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines."[13] (R. at 31.) The ALJ did not rely on VE testimony or any other evidence.

### 1. Grids

Relying on *Allsbury v. Barnhart*, 460 F. Supp. 2d 717 (E.D. Tex. 2006), and *Milligan v. Colvin,* No. 2:12-CV-101, 2013 WL 5345842, at *4-6 (N.D. Tex. Sep. 24, 2013), Plaintiff argues that the ALJ erred by solely relying on the Grids. (Doc. 23 at 17.) The Commissioner argues that the ALJ's sole reliance on the Grids was proper because Plaintiff "failed to show that her severe mental impairments prevented her from performing the unskilled work encompassed by the Grids." (Doc. 25 at 10.) She contends that the ALJ did not need expert testimony from a vocational expert because the Grids take administrative notice of unskilled work, which is work that involves simple instructions and decisions. (*Id.*)

In *Allsbury*, the court found that it was "internally inconsistent" for the ALJ to determine that claimant's nonexertional limitations were not significant enough to preclude sole use of the Grids

---

[13] Section 204.00 specifically fits Plaintiff's age category, education, and past work experience. 20 F.C.R. Pt. 404 Subpt. P, App. 2, Rule 204.00.

at step five when he previously found in step two that the claimant's nonexertional impairments were "severe which, by definition, means that they significantly limit plaintiff's ability to do basic work activities." 460 F. Supp. 2d at 726. In *Milligan*, the court expressly rejected the Commissioner's argument that characterization of a claimant's nonexertional limitations as limiting him "to an 'unskilled' occupational base is adequate" and that "the Grids establish that there are sufficient numbers of unskilled jobs available" because they take into account "an occupational based limited to unskilled jobs."  2013 WL 5345842, at *6.

Similar to the ALJs in *Allsbury* and *Milligan*, the ALJ in this case found at step two that Plaintiff's nonexertional limitations were severe and then based his step five findings solely on the Grids because her nonexertional limitations "have little or no effect on the occupational base of unskilled work." *See Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000); *see also Hearne v. Barnhart*, 111 F. App'x 256, 257-58 (5th Cir. 2004) (finding error where the ALJ relied solely on the Grids at step five when he found the claimant's depression to be a severe impairment under step two; explaining that "[i]n *Loza*, [the] Court linked the definition of a 'severe' impairment at Step Two to the determination of whether a claimant's nonexertional impairments significantly affected his [RFC] such that reliance solely upon the Grid Rules at Step Five would be inappropriate"); *see also Rodriguez v. Barnhart*, No. SA-05-CA-1203, 2006 WL 3779777, at *2 (W.D. Tex. Nov. 6, 2006) ("If the applicable rule directs a finding that plaintiff is not disabled, [however,] the Commissioner [must] consider nonexertional limitations and utilize the testimony of a vocational expert." ). The ALJ was required to make an individualized step five determination with the assistance of VE testimony or other similar evidence. *See Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988) ("[T]he ALJ's mechanical application of the guidelines failed to consider the aggregate impact of [the

claimant's] ailments."). Because the ALJ did not rely on VE testimony or other similar evidence in making his step five determination that Plaintiff could perform other work in the national economy, his decision was not based on substantial evidence. *Wingo*, 852 F.2d at 831 n.4.

### 2.   *Harmless Error*

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam).  "[P]rocedural improprieties . . . will therefore constitute a basis for remand *only if* such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722.  The Court must therefore consider whether the ALJ's error in failing to rely on VE testimony or other similar evidence in step five was harmless. *See January*, 400 F. App'x at 931-32 (applying harmless error analysis when the court ruled that the ALJ's reliance on the Grids before determining the claimant's restrictions significantly compromised the claimant's capacity to perform light work was an error).

Here, two SAMCs opined that Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence or pace and that she was limited to jobs "where interpersonal contact is routine but superficial [and where the] complexity of tasks is learned by experience." (R. at 162, 182.) The ALJ found that Plaintiff had psychological limitations of a

learning disability and mood disorder. (R. at 23.) Because the ALJ failed to consult a VE or utilize other similar evidence to develop the record, there is no evidence that Plaintiff's limitations have been incorporated into the jobs she could perform.  The ALJ's decision that Plaintiff could perform other work without consulting a VE or other similar evidence therefore affected Plaintiff's substantial rights.  The error is not harmless, and remand is warranted.

### III.  CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

**SO ORDERED** this 20th day of September, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE